[852 NE2d 1155, 819 NYS2d 684]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JAMAL PETTY, Appellant.

Argued June 6, 2006; decided July 5, 2006

## POINTS OF COUNSEL

*Legal Aid Society, Criminal Appeals Bureau,* New York City (*Natalie Rea* and *Laura R. Johnson* of counsel), for appellant. In this justification case, the court deprived appellant of his due process rights to a fair trial and to present a defense by erroneously (a) instructing the jury that evidence of threats by the victim against appellant were relevant only to appellant's state of mind and the reasonableness of his conduct, when this evidence was also admissible and critical to the question whether the victim was the initial aggressor and (b) precluding the testimony of the only defense witness connected to the victim who would have testified to such threats. (*People v Miller,* 39 NY2d 543; *People v Rodawald,* 177 NY 408; *Stokes v People,* 53 NY 164; *People v Wesley,* 76 NY2d 555; *People v Goetz,* 68 NY2d 96; *Wiggins v People,* 93 US 465; *People v Diallo,* 297 AD2d 247; *People v Owens,* 158 AD2d 478; *Crane v Kentucky,* 476 US 683; *Taylor v Illinois,* 484 US 400.)

*Robert T. Johnson, District Attorney,* Bronx (*Susan E. Baumgartner* and *Nancy D. Killian* of counsel), for respondent. I. The trial court correctly explained justification to the jury. (*People v Granados,* 198 AD2d 298; *People v Soriano,* 188 AD2d 420; *People v Baker,* 155 AD2d 398; *People v Miller,* 39 NY2d 543; *People v Fields,* 87 NY2d 821; *People v Owens,* 158 AD2d 478; *People v Aska,* 91 NY2d 979; *People v Thomas,* 275 AD2d 234; *People v Morales,* 11 AD3d 259, 4 NY3d 746; *People v Goetz,* 68 NY2d 96.) II. The trial court properly precluded Gail Smith

from offering cumulative and irrelevant hearsay. (*People v Corby,* 6 NY3d 231; *People v Harris,* 98 NY2d 452; *Stokes v People,* 53 NY 164; *Virginia v Black,* 538 US 343; *Watts v United States,* 394 US 705; *People v Dietze,* 75 NY2d 47; *People v Vincente,* 4 AD3d 217, 3 NY3d 649; *People v Schaefer,* 302 AD2d 333, 100 NY2d 542; *People v Luberoff,* 150 AD2d 802; *People v Boone,* 78 AD2d 461.)

## OPINION OF THE COURT

G.B. SMITH, J.

The principal issue in this case is whether the trial court erred when, during its justification charge, it instructed the jury that the deceased victim's prior threats against defendant may be considered solely in determining defendant's state of mind and the reasonableness of his conduct. We conclude that the trial court erred when it did not instruct the jury that these prior threats may also be used in the jury's determination of who was the initial aggressor. For reasons set forth below, however, we conclude that the error was harmless and affirm.

### Facts and Procedural History

On July 2, 1990, at approximately 11:30 P.M., defendant shot at Derrick Torrence twice, hitting him once in the back of the neck, and causing him to fall forward to the ground.[1] No weapon was found on or near Torrence. On July 10, 1990, defendant turned himself in. By indictment filed July 31, 1990, defendant was charged with attempted murder in the second degree, assault in the first degree and related offenses. Four months after the shooting, Torrence died from complications related to his condition. By superseding indictment filed December 14, 1990, defendant was charged with murder in the second degree, manslaughter in the first degree and related offenses.

During the People's case-in-chief, two young women who were friends of both defendant and Torrence testified that shortly before the shooting, they saw the two on the grounds of the Mayor John Purroy Mitchel Houses in the Bronx. Both witnesses, who were aware of a feud between defendant and Torrence, also testified that the housing development's lights were on.

The first witness testified that shortly before the shooting, she spoke to and joked with Torrence who was wearing a tee

---

1. Torrence sustained severe injuries to his cervical spine and spinal cord, and was rendered a quadriplegic.

shirt, pants and sneakers, but no coat. During this exchange, the witness did not notice a weapon on Torrence. After the exchange, the witness, who was on a bicycle, and Torrence went in opposite directions. Torrence headed in the direction of his home. Shortly thereafter, the witness heard someone shout a warning to Torrence. She then turned and saw defendant approaching Torrence. According to the witness, Torrence turned toward her, looking scared, and made a motion with his hands toward his waist as if he was preparing to run. This witness could not see whether Torrence placed his hand in his waist. Nor did she see what Torrence was doing right before defendant fired, as her attention was primarily on defendant. The witness further testified that she was about 12 feet from Torrence when defendant fired the gun.

The second witness was seated on a bench with friends about 30 feet from where she saw defendant approach Torrence. Because her focus was primarily on defendant, this witness likewise did not see whether Torrence reached for anything. However, she did testify that when defendant pulled out his gun, Torrence turned away. She further testified that she could see Torrence's hands right before the shooting and that Torrence did not threaten defendant, and after the shooting, defendant approached her with gun in hand and asked whether any of Torrence's friends were in the area. Both young women estimated that defendant came to within five to eight feet of Torrence before firing the two shots. Further, the medical examiner testified that because the bullet that hit Torrence entered the back of his neck, he could not have been facing defendant at the time of the shooting.[2]

During defendant's case-in-chief, defendant admitted shooting and causing the death of Torrence. However, defendant claimed that the shooting was justified because threats and violence by Torrence and his friends, made and carried out prior to the date of the shooting, led to defendant's reasonable belief that when Torrence reached toward his waist on the night of July 2, 1990, he was going to draw a weapon in order to kill defendant.

Defendant, his brother and two friends testified that, over an 11-day period starting on June 21, 1990, Torrence repeatedly threatened to kill defendant. According to the testimony of these four individuals, on June 21, 1990, defendant and Torrence

---

2. Torrence's treating physician gave similar testimony on this point.

played a $2 dice game which Torrence lost. When Torrence refused to pay, he and defendant got into a fistfight which defendant won. When defendant and Torrence were separated, Torrence directed a number of statements at defendant. Most of these statements were either future threats to kill defendant or angry words that would not constitute a threat of harm.

Defendant and other defense witnesses further testified that on June 22, 1990, Torrence and his friends attacked defendant and his friends. During this fight, a friend of Torrence shot one of defendant's friends in the back of his shoulder. According to defendant and two other defense witnesses, Torrence directed his friend to shoot defendant during the fight, but the shooter missed.

During his testimony, defendant also recounted a June 29, 1990 conversation he had with the girlfriend of the shooter in the June 22 melee. According to defendant, the woman told him that on June 28, 1990, she, along with Torrence and her then-boyfriend, took part in a three-way telephone conversation in which Torrence stated that he was coming to kill defendant. When counsel asked defendant, "What . . . effect did this have on your state of mind," the People objected. The trial court sustained the objection on the ground that the proposed testimony was irrelevant and stated that the only issue of relevance was "whether or not at the instance in question on July 2nd, . . . defendant had a reasonable belief as to certain conduct that it may or may not be alleged that . . . defendant did."

Regarding the shooting at issue here, defendant testified that he was visiting a friend who was aware of the animus between defendant and Torrence. At about 11:00 P.M., defendant decided to leave his friend's home and see his girlfriend and their two-year-old daughter. His friend gave him an illegal .38 caliber handgun for protection. While walking outside, defendant came upon Torrence who stood motionless with his hands at his sides, some 40 to 50 feet away. Torrence "turned his body" and feet away, but defendant claimed that he could see the upper half of Torrence's body as well as both of his hands. Noting that no words were exchanged between the two men, defendant testified that Torrence (who was left-handed) "just reached" toward his waistband with his right hand. Defendant, who never saw a gun or other weapon on Torrence, claimed that, as a result of the "reaching" gesture, he felt that his life was in danger. Defendant fired his gun twice, but claimed that he did not aim or

look where he was firing, and did not know whether Torrence was facing him or not.

The defense also sought to call the female participant in the June 28 three-way telephone conversation who would testify that during the conversation, her then-boyfriend said the bullet that struck defendant's friend on June 22 was meant for defendant. The defense argued that this testimony would yield evidence of Torrence's prior threats that were admissible on the initial aggressor and reasonableness questions. The trial court, ruling that the proposed testimony was hearsay and cumulative, denied the defense's request.

During the People's rebuttal case, the shooter in the June 22 incident testified that he had not been instructed by Torrence to shoot defendant, or anyone else, and that he had no reason for shooting the person he shot. On surrebuttal, the defense again sought to call the shooter's girlfriend, this time to impeach his rebuttal testimony. The trial court, ruling that the proffered testimony was collateral and hearsay, once again precluded her testimony.

The trial court's justification charge was the subject of extensive discussion. At a precharge conference, defense counsel noted that Torrence's prior alleged threats against defendant bore on Torrence's state of mind at the time of their final encounter. That is, these threats were not only relevant to the question of whether defendant's beliefs and actions were reasonable, but were also relevant to the determination of who was the initial aggressor. In rejecting the portion of defendant's proposed charge permitting the use of threats in the initial aggressor determination, the trial court pointed out that the circumstances of this case were not typical of most justification cases because only defendant had a weapon. The trial court also stated that the charge defendant requested would require the court to discuss that Torrence did not have a gun or other weapon at the time of the shooting.

In relevant part, the trial court charged the jury as follows:

> "You have heard testimony in this case regarding what occurred on June 21, June 22 and other dates preceding July 2, 1990. In conducting your evaluation of the evidence you may or may not credit individual accounts of those prior alleged incidents and if you do find that they occurred as submitted you may or may not have occasion to consider them in

connection with your evaluation of the defendant's claim of justification or self-defense.

"As you will learn shortly any such consideration of such occurrences is limited to a specific issue in [the] law of justification. The defendant's state of mind on July 2, 1990, at the instant of the shooting, but other than that purpose, those alleged incidents are . . . separate and distinct from the shooting that you are to evaluate and may not be brought to bear on your judgment other than as I will instruct."

The court further stated that in order to determine whether defendant may even raise the justification defense, the jury must first decide who, during the July 2, 1990 encounter between defendant and Torrence, was the initial aggressor; however, the court explained that:

"The law does not authorize the use of deadly physical force offensively, that is non-responsively. Furthermore, the law recognizes that a person's evaluation of whether another is about to use deadly physical force against him and whether deadly physical force is needed defensively may take into account prior violent acts or threats from the other person against the actor.

"Thus, acts or threats[,] if the jury finds that they did in fact occur[,] may be considered by the jury insofar as they bear on what the actor reasonably believed was about to occur and was necessary in response.

"However past violent acts or threats do not themselves render deadly physical force defensive, regardless of [whether] a jury believes [what] previously occurred is offensive deadly physical force. Here, testimony of prior violent acts or threats by [Torrence] against [defendant], if credited by you[,] may be relevant as to what [defendant] reasonably believed on July 2, 1990."

Regarding the jury's determination of the initial aggressor question, the court instructed the jury that, "whether [defendant] was or was not the aggressor will turn on what you find Derrick Torrence did or did not do on July 2, 1990[,] in the moments before he was shot[,] as well as what you find [defendant] did or did not reasonably believe on July 2, 1990[,] at the moment he fired a shot at Derrick Torrence."

Defendant objected to the charge and again requested that the jury be instructed that Torrence's threats were also relevant as to the question of who was the initial aggressor on July 2, 1990. The trial court again denied the request.

During deliberations the jury asked for clarification of the justification charge on four separate occasions and temporarily deadlocked on the homicide charges. After receiving a supplemental charge from the court, the jury acquitted defendant of second degree murder but found him guilty of manslaughter in the first degree and criminal possession of a weapon in the second and third degrees. Defendant was sentenced to an aggregate term of 8⅓ to 25 years in prison. The Appellate Division affirmed the judgment of conviction. A Judge of this Court granted defendant leave to appeal, and we now affirm.

## Discussion

Penal Law § 35.15 (1) (b) provides that:

> "A person may, subject to the provisions of subdivision two, use physical force upon another person when and to the extent he or she reasonably believes such to be necessary to defend himself, herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person, unless: . . .

> "[t]he actor was the initial aggressor."[3]

A trial court must charge the factfinder on the defense of justification "whenever there is evidence to support it" (*People v McManus*, 67 NY2d 541, 549 [1986]). Viewing the record in the light most favorable to the defendant, a court must determine whether any reasonable view of the evidence would permit the factfinder to conclude that the defendant's conduct was justified. If such evidence is in the record, the court must provide an instruction on the defense (*id.*). Here, the trial court found some evidence in the record supporting the defense and, accordingly, charged the jury. Having charged the defense, however, it was incumbent upon the court to instruct that the "perceptions [and] state of mind[ ] of the participants to the encounter are critical" (*People v Miller*, 39 NY2d 543, 548 [1976]).

---

**3.** Penal Law § 35.15 (2) (a) provides, in relevant part, that: "A person may not use deadly physical force upon another person under circumstances specified in subdivision one unless: . . . [t]he actor reasonably believes that such other person is using or about to use deadly physical force."

When justification is in issue, the trier of fact must first determine whether the defendant was the initial aggressor. If the answer to this question is yes, the justification defense is generally not available to defendant.[4] If the answer to this question is no, the trier of fact must then determine whether defendant's conduct (e.g., use of deadly force) was reasonable (*see People v Goetz*, 68 NY2d 96, 106 [1986]). Thus, the initial aggressor and reasonableness questions represent separate components of the justification defense (*see generally* Penal Law § 35.15).

With respect to the initial aggressor issue, we first affirm that *Stokes v People* (53 NY 164 [1873]) and *People v Miller* (39 NY2d 543 [1976]) remain good law. In *Stokes v People*, this Court held that evidence of a deceased victim's prior threats against defendant is admissible to prove that the victim was the initial aggressor, whether or not such threats are communicated to defendant (*see Stokes v People*, 53 NY at 174-175; *see also People v Miller*, 39 NY2d at 549). The *Stokes* court reasoned that such threats may indicate an intent to act upon them, thereby creating a probability that the deceased victim has in fact acted upon them as the initial aggressor (*see Stokes v People*, 53 NY at 175). This Court subsequently observed that, even "if the defendant was not aware of the threat, the threat still is probative of the deceased's state of mind and bears, thus, on whether the deceased was the aggressor" (*People v Miller*, 39 NY2d at 549, citing *Stokes v People*, 53 NY at 174).

■ Here, having instructed the jury on the use of Torrence's prior threats against defendant for the purpose of determining defendant's reasonableness, the trial court, based on this Court's long-standing precedent, should have also instructed the jury that, for its initial aggressor determination, it was permitted to use the prior threats that it heard throughout the trial. Under the circumstances of this case, however, the omission in the trial court's charge does not warrant reversal of defendant's conviction.

We hold that the People disproved the justification defense. According to the proof adduced at trial, on July 2, 1990, Torrence did not have a weapon. He did not say anything to or make a threatening gesture towards defendant. He tried to run

---

4. An initial aggressor who withdraws from the encounter and effectively communicates that withdrawal may be justified in using physical force if the other person persists in continuing the incident (*see* Penal Law § 35.15 [1] [b]).

away. Finally, when defendant fired the gun and struck Torrence in the back of the neck, Torrence could not have been facing defendant.[5] This evidence overwhelmingly shows that defendant was the initial and only aggressor. Defendant's use of deadly physical force was unreasonable because there is no persuasive evidence that Torrence used or was about to use deadly physical force against defendant on the night of the shooting. Thus, the shooting of Torrence was unjustified.

Because there was overwhelming evidence disproving the justification defense and no reasonable possibility that the verdict would have been different had the charge been correctly given, the error in the trial court's justification charge was harmless (*see People v Crimmins*, 36 NY2d 230, 242 [1975]).

We further conclude that defendant's remaining contentions lack merit. The trial court has discretion to admit or preclude relevant evidence based on an analysis of its probative value versus whether it confuses the main issues and misleads the jury (*see People v Davis*, 43 NY2d 17, 27 [1977] ["even if the evidence is proximately relevant, it may be rejected if its probative value is outweighed by the danger that its admission would prolong the trial to an unreasonable extent without any corresponding advantage (e.g., where cumulative evidence is proffered); or would confuse the main issue and mislead the jury; or unfairly surprise a party; or create substantial danger of undue prejudice to one of the parties"]; *see also People v Corby*, 6 NY3d 231, 234-235 [2005]; Prince, Richardson on Evidence § 4-103 [Farrell 11th ed]).

■■ Defendant contends that the trial court on two occasions improperly precluded testimony of the female participant in the three-way telephone call on June 28. During defendant's case-in-chief, defendant sought her testimony as to threats Torrence made against defendant a few days prior to the day of the shooting. By the time the defense made its request to the court, however, four defense witnesses, including defendant, had already testified that prior to the shooting, Torrence made numerous threats against defendant. Additionally, the proposed testimony did not relate to any threats made against defendant on the day of the shooting. Thus, we conclude that the evidence was cumulative and that the trial court properly exercised its

---

5. Defendant's claims that he was a great distance from Torrence and that he shot without looking or aiming are inconsistent with the testimony of every other witness.

discretion when it excluded the evidence. During surrebuttal, defendant sought her testimony to contradict the testimony of a witness concerning a matter collateral to the issues before the court. The introduction of such contradictory testimony is not generally permitted and the trial court properly excluded it (*see People v Alvino*, 71 NY2d 233, 247-248 [1987]).

Accordingly, the order of the Appellate Division should be affirmed.

Chief Judge KAYE and Judges CIPARICK, ROSENBLATT, GRAFFEO, READ and R.S. SMITH concur.

Order affirmed.